UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CINDIE M. ALKIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00094-TWP-TAB |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Cindie M. Alkire ("Alkire") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

## I. BACKGROUND

### A. Procedural History

On April 26, 2012, Alkire protectively filed applications for DIB and SSI, alleging a disability onset date of February 20, 2011, due to epilepsy and depression. Her claims were initially denied on July 24, 2012, and again on reconsideration. Thereafter, she filed a written request for a hearing and a hearing was held via video conference before Administrative Law Judge Denise McDuffie Martin (the "ALJ"). Ronald Malik, an impartial vocational expert, and Ellen

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

Rozenfeld, an impartial medical expert, appeared and testified at the hearing. She was represented by counsel. On September 12, 2013, the ALJ denied Alkire's applications for DIB and SSI. Following this decision, Alkire requested review by the Appeals Council and on November 18, 2014, the Appeals Council denied Alkire's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On January 23, 2015, Alkire filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.**    **Factual Background**

At the time of her alleged disability onset date, Alkire was 32 years old, and she was 34 years old at the time of the ALJ's decision. Alkire graduated from high school and completed some college. She also is qualified as a licensed practical nurse ("LPN"). Prior to the onset of her alleged disability, Alkire had an employment history of skilled and semi-skilled jobs that required a diverse range of exertion from light to heavy. She worked as a LPN, certified nurse's assistant, server, and sales clerk. Alkire asserts that she left her last employment as a LPN because she started experiencing epileptic seizures while at work.

Alkire was seen by her primary care physician, Keval Patel, MD ("Dr. Patel"), on a fairly regular and frequent basis. In February 2011, she had an unexpected episode of passing out, so she presented to Dr. Patel for evaluation. She reported remembering climbing back into bed and that her husband told her that items, including her eyeglasses, were strewn on the kitchen floor, but she did not recall getting up to go to the kitchen. Dr. Patel evaluated Alkire and then admitted her to the hospital for further evaluation. While at the hospital, she was evaluated by Raj Rajeswaren, MD ("Dr. Rajeswaren"), a neurologist. Upon physical examination, Alkire's systems appeared normal. She reported having soreness and weakness all over. She also reported never

experiencing a prior episode of passing out, no head injuries, and no low blood sugar attacks (Filing No. 7-7 at 16).  Dr. Rajeswaren ordered a brain MRI, which revealed lesions on the left and right frontal region of her brain.  He also ordered an EEG test, which provided normal results.

In June 2011, Alkire was sent home from work approximately four times in a period of two weeks because she was experiencing seizures at work.  Earlier in the year, she had been experiencing episodes of unawareness lasting several minutes, which were accompanied by a loss of control of her extremities and falling.  These episodes were followed by two or three minutes of memory loss and two or three days of lethargy.  Alkire sought care at Provena United Medical Center for the episodes when they suddenly began occurring at work.  The medical professionals opined that she was experiencing epileptic focal seizures as well as complications from diabetes.

On July 28, 2011, Dr. Rajeswaren conducted a neurological evaluation.  He noted that Alkire had experienced episodes of unawareness but could follow directions during these episodes.  Alkire reported that these episodes of unawareness were followed by slowness in thinking and fatigue.  She had experienced an episode in May and again a few days before her July 28, 2011 appointment.  On examination, Alkire was alert, cooperative, and in no apparent physical discomfort.  Her speech was clear, and she had no tremors.  Her muscle reflexes were bilaterally symmetrical, and her gait and station were normal.  Dr. Rajeswaren reviewed the February 2011 brain MRI, which showed lesions on the left and right frontal region of Alkire's brain.  Dr. Rajeswaren's impression was that Alkire had partial complex epilepsy (Filing No. 7-7 at 3).

Following this examination, Dr. Rajeswaren directed Alkire to avoid driving, working at heights more than three feet, cooking over an open flame or grill, and taking a bath in a bath tub. He prescribed a seizure medication and directed her to return for a follow-up appointment one month later.  *Id.*

3

At her follow-up appointment with Dr. Rajeswaren on August 25, 2011, Alkire reported that she had two episodes of unawareness during that past month, and she was not working. She explained that she had experienced a migraine with nausea and had some lingering pain. On examination, she again was alert, cooperative, and in no apparent physical discomfort. Her speech was clear, and she had no tremors. She was diagnosed with reasonably well-controlled partial complex epilepsy (Filing No. 7-7 at 4). During office visits to her primary care physician, Dr. Patel, in September 2011, she had no neurological symptoms or disturbances.

Alkire was admitted to the hospital on October 1, 2011, after she had experienced an episode of passing out at home. An EEG test was conducted, which provided normal results. A CT scan of her head showed no changes since her tests earlier in the year. At her follow-up appointment with Dr. Rajeswaren on October 19, 2011, Alkire reported that she did not have any other episodes since the episode on October 1, 2011. On examination, she had no tremors. Her gait and station were normal, and her tandem gait was mildly impaired. Dr. Rajeswaren noted a diagnosis of partial complex epilepsy with a breakthrough episode on October 1, 2011. He instructed Alkire to refrain from driving for six months and set a follow-up appointment in three months.

Alkire had a seizure on Thanksgiving Day 2011. She then presented to Dr. Rajeswaren on January 12, 2012, for her follow-up appointment and reported that she had not experienced another seizure since Thanksgiving Day. She noted that she had been experiencing headaches and some nausea one to two times a week. Upon examination, she was alert, cooperative, and in no apparent physical discomfort. Her speech was clear. She had no tremors, her gait and station were normal, and her tandem gait was normal.

4

On January 25, 2012, Alkire presented to a neurologist, Vincenta Salanova, MD ("Dr. Salanova"), as a new patient.  Dr. Salanova noted that an MRI and EEG had been taken in 2011, and she recorded Alkire's complaints of unresponsiveness and seizures.  Dr. Salanova conducted a physical examination and noted that Alkire had normal speech.  She had psychomotor slowness, but she was alert and oriented.  She had no ataxia, no nystagmus, no pronator drift, and no visual field deficit.  She had mild facial asymmetry and mild finger-to-nose dysmetria.  Her reflexes appeared diminished in the lower extremities, and she had tremors in her hands (Filing No. 7-7 at 65).

On March 9, 2012, Dr. Rajeswaren conducted a follow-up appointment with Alkire.  She reported that she had not experienced another major seizure since the Thanksgiving Day seizure.  However, she reported that she had frequent episodes of "spacing out" and steady pain behind her eyes.  Dr. Rajeswaren noted that she had no tremors in her hands. Her gait and station were normal as well as her tandem gait.  Her speech was clear, and she was alert, cooperative, and in no apparent physical discomfort.

During an office visit to Dr. Patel, her primary care physician, on May 10, 2012, Alkire had no neurological symptoms or disturbances.  At a follow-up appointment with Dr. Rajeswaren on June 8, 2012, Alkire reported that she was experiencing episodes of unawareness, occasional double vision, occasional headaches, and occasional jerking of the limbs.  She also reported that she cooked and cleaned at home.  On examination, she was alert, cooperative, and in no apparent physical discomfort.  Her speech was clear.  Tremor of the hands was noted, and her gait and station and tandem gait were normal.  Over the course of her treatment between August 2011 and June 2012, Alkire's dosage of epilepsy medication was incrementally increased to the maximum dosage: 250 milligrams each morning and 500 milligrams each night.

On July 6, 2012, Alkire was evaluated by examining physician, Luella Bangura, MD ("Dr. Bangura"). The neurological evaluation revealed normal and symmetric findings, and cerebellar functions appeared normal. Dr. Bangura opined that Alkire could stand and walk for at least two hours and sit for at least two hours in a workday. Dr. Bangura also opined that she could frequently lift or carry less than ten pounds and occasionally lift or carry more than ten pounds. She noted limitations in memory, understanding, concentration, and social interaction.

At another follow-up appointment with Dr. Rajeswaren on October 4, 2012, Alkire reported that she was experiencing short-term memory problems, difficulty concentrating, shaky hands, and difficulty with balance. She had weekly episodes of unawareness, but it was unclear whether she was experiencing seizures that often. She reported that she had applied for SSI and DIB. On examination, Alkire was alert, cooperative, and in no apparent physical distress. She had tremors in her hands, pronounced on the left side. Her gait and station were normal, and her tandem gait was mildly impaired. Dr. Rajeswaren's impression was that Alkire had partial complex epilepsy, not well controlled (Filing No. 7-7 at 155).

On June 5, 2013, Alkire returned to Dr. Salanova because of her "history of recurring episodes of staring and unresponsiveness." (Filing No. 7-8 at 13.) Dr. Salanova noted that she first saw Alkire in January 2012 and that Alkire had undergone a two-day video EEG since that appointment. The video EEG that had been conducted over a continuous, two-day period returned normal results, and Alkire did not have any "events" during the procedure. Dr. Salanova also noted that Alkire had applied for disability benefits but had been denied. Dr. Salanova wrote, "In my opinion, she deserved disability," and her episodes were "quite disabling. In my opinion, this patient deserves disability." (Filing No. 7-8 at 13–14.) Dr. Salanova ordered another video EEG and another head MRI for Alkire.

At the June 5, 2013 appointment with Dr. Salanova, Alkire underwent a physical examination. Her speech was normal. She was alert and oriented. Her reflexes were symmetrical. She had no nystagmus, no dysmetria, no facial weakness, no pronator drift, and no tremors in her hands.

Alkire's June 14, 2013 MRI showed the lesions that had been discovered on the February 2011 MRI. The MRI also indicated that there was some asymmetric volume loss in the right hippocampus compared to the left hippocampus, but there was no abnormal signal intensity (Filing No. 7-8 at 16). Alkire underwent another two-day video EEG from January 24 to January 26, 2013. During the two-day EEG test, Alkire experienced no seizures, no epileptiform discharges, and no epileptiform abnormalities; thus, the results of the EEG test were again normal (Filing No. 7-8 at 17).

Alkire had gestational diabetes during all three of her pregnancies. After having her third child in March 2007, Alkire remained diabetic. She takes oral and intravenous medication for her diabetes and checks her blood sugar regularly. She occasionally experiences neuropathy in her legs and feet as a result of her diabetes.

At the disability administrative hearing, Alkire testified that she believed she started suffering from depression when she was diagnosed and successfully treated for cancer when she was a child. However, her depression manifested itself in 2009 after her father died. She did not want to go anywhere, do anything social, or get out of bed. She did, however, continue working. She testified that she occasionally has crying episodes and does not want to do anything, and her sleep is sometimes affected by her depression. Soon after her father's death, Alkire discussed her depression with her primary care physician, Dr. Patel, who prescribed a depression medication.

Alkire does not believe that the medication is helping her depression, but her husband noticed an improvement.  Alkire has had no psychiatric hospitalizations and no episodes of decompensation.

On July 9, 2012, Gerald Gruen, Ph.D. ("Dr. Gruen") conducted a mental status evaluation of Alkire as part of the disability determination process ([Filing No. 7-7 at 147](#)–150).  Alkire was oriented to person, place, and time.  She had good recent and remote memory and a good fund of knowledge.  Her thinking was logical and sequential.  There was no evidence of thought disorder.  She did not distort things perceptually or conceptually.  Alkire's speech was coherent and fluent.  She made good eye contact.  She reported that her problems with concentration, focus, and memory loss mainly relate to her seizures.  Throughout the evaluation, she was able to maintain good concentration and attention.  She reported that she was not currently experiencing a depressed mood very often, and she felt good, especially with her depression medication.  Dr. Gruen diagnosed Alkire with a cognitive disorder, not otherwise specified, possibly due to her reported seizures.  He assigned a global assessment of functioning score of 55 and noted that she could not manage her personal funds without the help of her husband because of her problems with memory and focus.  Dr. Gruen noted that Alkire appeared to be psychologically healthy in most areas of her life except for the consequences of her reported seizure disorder, and that if her seizures could be controlled, she probably could function well.

Kari Kennedy, Psy.D. ("Dr. Kennedy"), a state agency psychologist, completed a "Mental Residual Functional Capacity Assessment" and a "Psychiatric Review Technique" form on July 16, 2012, as part of the disability determination process ([Filing No. 7-7 at 67](#)–83).  Dr. Kennedy considered Listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). Dr. Kennedy opined that Alkire had a cognitive disorder, an affective disorder, and an anxiety-related disorder, not otherwise specified, each of which did not meet

diagnostic criteria. Dr. Kennedy further opined that Alkire was only mildly limited in activities of daily living and maintaining social functioning, with moderate limitations in maintaining concentration, persistence, or pace. She noted no episodes of decompensation. In four of the assessment categories, Dr. Kennedy opined that Alkire is moderately limited—the ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions due to her need to take an unreasonable number of rest periods. In the sixteen other assessment categories, Dr. Kennedy opined that Alkire is not significantly limited. On November 14, 2012, Joelle Larsen, Ph.D., another state agency psychologist, reviewed Alkire's file and Dr. Kennedy's assessment and then affirmed Dr. Kennedy's assessment as written.

On July 19, 2012, Bruce Whitley, MD ("Dr. Whitley"), a state agency physician, completed a "Physical Residual Functional Capacity Assessment" for Alkire (Filing No. 7-7 at 85–92). Dr. Whitley considered Alkire's partial complex epilepsy and her diabetes. He opined that Alkire could occasionally lift or carry up to fifty pounds and frequently lift or carry twenty-five pounds. Dr. Whitley noted that she could sit for six hours in an eight-hour workday and stand or walk for six hours in an eight-hour workday. He opined that Alkire should never climb ladders, ropes, or scaffolds, but otherwise she was not physically limited. He noted that she should never be exposed to unprotected heights and machinery. Dr. Whitley opined that Alkire's seizures did not rise to the listing level. He also opined that Alkire's allegations of the severity of her conditions and her functional limitations were not supported by the medical evidence.

On November 13, 2012, Michael Brill, MD ("Dr. Brill"), another state agency physician, completed an additional "Physical Residual Functional Capacity Assessment" for Alkire (Filing No. 7-8 at 2–9). Dr. Brill considered Alkire's partial complex seizures. He opined that there were

no exertional or physical limitations for Alkire and noted a restriction from any exposure to hazards such as machinery and heights.

Only a few days before the disability administrative hearing, Dr. Salanova completed a "Seizures Residual Functional Capacity Questionnaire" on behalf of Alkire on June 28, 2013 (Filing No. 7-8 at 24–27). Dr. Salanova opined that Alkire is incapable of even low stress jobs, would be absent from work more than four days per month, and would need to take several unscheduled breaks in an eight-hour work day. Dr. Salanova further opined that Alkire would require more supervision than co-workers, and her seizures likely would disrupt the work of her co-workers. She likely would be affected by lethargy and poor coordination at work due to her medication. Dr. Salanova noted that Alkire's seizures occurred two to three times per week, and they resulted in confusion, exhaustion, shakiness, and unsteadiness of gait for several hours following an episode, which would greatly interfere with her functioning.

On the day of the disability administrative hearing, nurse practitioner Stephanie Arnold completed a "Diabetes Mellitus Residual Functional Capacity Questionnaire" on behalf of Alkire (Filing No. 7-8 at 51–55). Ms. Arnold identified the symptoms of Alkire's diabetes and then opined that she should avoid moderate exposure to extreme cold, wetness, perfumes, soldering fluxes, fumes, odors, and gases. Ms. Arnold also opined that Alkire likely would miss more than four days per month due to her impairments.

Concerning her day-to-day routine, Alkire usually gets her children out of bed and makes a simple breakfast. She helps her children get ready for school and then gets them off to school. She does some chores around the house, especially laundry, while her husband and children are gone. Alkire was instructed not to take baths in a bath tub, but instead shower, and she is able to do so, but her husband often will monitor her while she is getting ready. She prepares simple

lunches for herself and her children, and she can cook meals; however, she was directed not to cook over an open flame or grill.  She enjoys reading books and watching television and movies. Sometimes she has to reread chapters in her books to remember what is happening in the story. She goes shopping and grocery shopping with her husband.  She helps take care of the family's dogs and does activities with her children.  She and her family attend church services frequently, and she enjoys singing in the church choir.

Her husband coaches the softball team for one of their daughters, so Alkire attends the softball games with her family.  She socializes with other people in attendance at the softball games.  While Alkire's neurologist directed her not to drive a car, on occasion, she drives short distances, such as to her daughter's softball game.  Friends from church occasionally come over to Alkire's home to help with household duties.

## II.   DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors.  20 C.F.R. § 416.920(a)(4)(i).  At step two, if the

claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps.  Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations."  *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p).  At step four, if the claimant is able to perform his past relevant work, he is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).  At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome."  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.   THE ALJ'S DECISION

The ALJ first determined that Alkire met the insured status requirements of the Act through December 31, 2016.  The ALJ then began the five step disability analysis.  At step one, the ALJ found that Alkire had not engaged in substantial gainful activity since February 20, 2011, the alleged onset date of disability.  At step two, the ALJ found that Alkire had the following severe impairments: epilepsy, cognitive disorder, depression, and anxiety.   At step three, the ALJ concluded that Alkire does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Alkire has an RFC to perform sedentary work with certain limitations.  She determined that Alkire can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl. She should avoid all exposure to unprotected heights and dangerous moving machinery, and she should not drive.  The ALJ determined that Alkire has the mental RFC to perform unskilled, simple, routine, repetitive tasks with no fast-paced or high production quotas.  She is able to interact appropriately with co-workers and supervisors on an occasional basis (Filing No. 7-2 at 23).

At step four, the ALJ determined that Alkire was unable to perform her past work as a LPN, certified nurse's assistant, server, or sales clerk because the demands of her past relevant work exceeded her RFC.  At step five, the ALJ determined that Alkire is not disabled because there are jobs that exist in significant numbers in the national and state economy that Alkire could perform, considering her age, education, past work experience, and RFC. Therefore, the ALJ denied Alkire's applications for DIB and SSI because she is not disabled.

## IV.  DISCUSSION

In her request for judicial review, Alkire argues that the ALJ's decision contains three errors that warrant remand.  First, she argues that the ALJ did not give proper weight to the opinions and findings of her treating neurologist, Dr. Salanova.  Second, Alkire argues that the ALJ failed to properly consider Listing 12.04 at Step Three of the disability determination.  Third, she argues that the ALJ failed to incorporate necessary limitations in the RFC determination when considering her ability to perform sedentary work.  The Court will address each of these arguments in turn.

**A.**    **The ALJ Properly Weighed the Opinions of Alkire's Treating Neurologist**

First, Alkire argues that the ALJ failed to give proper weight to the opinions and findings of her treating neurologist, Dr. Salanova. She explains that the ALJ had access to the findings and opinions of Dr. Salanova, but failed to provide any explanation for rejecting Dr. Salanova's opinion. Relying on *Scrogham v. Colvin*, 765 F.3d 685, 696–98 (7th Cir. 2014), She asserts that this failure warrants remand because Seventh Circuit case law requires the ALJ to specifically state the reasons for rejecting the opinion of a treating physician. When giving less weight to a treating physician's opinion, Alkire asserts that the ALJ must address five factors: (1) the length of the treatment relationship and the frequency of examinations, (2) the nature and extent of the treatment relationship, (3) the supportability of the physician's opinions, (4) consistency of the opinions with the record as a whole, and (5) whether the treating physician is a specialist in the relevant area. *Id.*

The Commissioner responds to Alkire's argument by explaining that an ALJ may properly discredit the medical opinion of a treating physician as long as she provides "good reasons" for doing so. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). Furthermore, "[i]f the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons--a very deferential standard that we have, in fact, deemed 'lax.'" *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Commissioner discusses the medical evidence itself as well as the ALJ's discussion of the objective medical evidence and the medical opinions that undermined Dr. Salanova's opinions. The Commissioner explains that there was substantial evidence, as discussed by the ALJ, to support her finding that Dr. Salanova's opinion was entitled to less weight.

An ALJ gives a treating physician's opinion "controlling weight" only if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). Further, the Seventh Circuit has "disapproved any mechanical rule that the views of a treating physician prevail." *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001). Alkire argues that this case should be remanded because the ALJ failed to provide any reason whatsoever to justify giving Dr. Salanova's opinion less than controlling weight.

A review of the ALJ's decision reveals that the ALJ thoroughly considered the objective medical evidence and the opinions of the treating, examining, and reviewing physicians. The ALJ considered the various EEG tests, CT scan, and MRIs that were performed and then described those results. She considered and addressed the findings from the treating and examining physicians' physical examinations of Alkire. She noted the frequent normal findings as well as the occasional abnormal results and findings from tests. She also considered and discussed the assessments of the state agency physicians, who opined that Alkire was not significantly limited. When specifically addressing Dr. Salanova's treatment of Alkire, the ALJ noted the many normal neurological findings of Dr. Salanova. She also specifically noted the objective EEG test and its normal results, which Dr. Salanova reviewed.

The ALJ then discussed Dr. Salanova's opinion, which was rendered in her "Seizures Residual Functional Capacity Questionnaire." Dr. Salanova set significant limitations on Alkire: she would be absent from work more than four days per month; she would need to take several unscheduled breaks in an eight-hour work day; and she was incapable of even low stress jobs. Dr. Salanova also opined that Alkire's seizures occurred two to three times per week, and they resulted in confusion, exhaustion, shakiness, and unsteadiness of gait for several hours, which would greatly interfere with her functioning. The ALJ then explained, "I have not assigned any

16

significant weight to Dr. Salanova's opinion as it is not well supported by the other substantial medical evidence of record." (Filing No. 7-2 at 29.) The ALJ's reason for giving Dr. Salanova's opinion less weight concerns the factors of "supportability of the physician's opinions," "consistency of the opinions with the record as a whole," and whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."

Contrary to Alkire's assertion that the ALJ failed to provide any reasons for rejecting Dr. Salanova's opinion, the ALJ gave a "good reason" for giving the opinion less weight after she had considered all the evidence before her and determined that the opinion was not supported by the substantial medical evidence. The ALJ sufficiently explained the basis for her decision.

The Court may not reweigh evidence in order to determine whether a more favorable outcome for Alkire could have been provided. The decision of the ALJ was reasonable and justified with sufficient explanation and substantial evidence. It is within the authority of the ALJ to determine how much weight to give the evidence. It is not within the province of a treating physician to make the final determination of Alkire's RFC. This determination is reserved for the ALJ. The ALJ provided a reasonable explanation for weighing the evidence and making her determination. There is no reason to reverse that decision.

**B.**     **The ALJ's Step Three Consideration was Sufficient and Supported by Substantial Evidence**

Next, Alkire argues that the ALJ failed to properly consider all of her limitations when considering Listing 12.04 (affective disorders) at Step Three of the disability determination. She explains that an impairment, such as her depression, meets the Listing 12.04 impairment when it results in at least two of the "paragraph B" criteria. These criteria are: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of

decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04 Affective disorders.  A "marked" limitation is one that is more than "moderate" but less than "extreme."  *See Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

Alkire asserts that the ALJ failed to consider her physical and mental limitations when considering her epilepsy and depression under Listing 12.04.  She asserts that the ALJ did not consider her dependence on her husband to complete necessary daily activities, and points out her husband's assistance with household chores, preparing meals, and showering.  She mentions her husband's help when he leaves a list of household chores for her to accomplish.

In response, the Commissioner asserts that the ALJ considered all the evidence, and the decision regarding medical equivalence was based on substantial medical evidence, which included the opinions of state agency reviewing physicians and psychologists Dr. Whitley, Dr. Brill, Dr. Kennedy, and Dr. Larsen.  "The Seventh Circuit has acknowledged that, in the absence of contrary medical opinions, the opinions of state-agency reviewing physicians and psychologists constitute substantial evidence on the issue of whether a claimant meets or medically equals any listing, because state-agency doctors are experts on determining medical equivalence."  (Filing No. 10 at 6.)  The Commissioner explains that the state agency physicians' and psychologists' medical opinions about medical equivalence supported the ALJ's decision at Step Three.

Upon review of the ALJ's decision, it is clear that the ALJ did consider all the facts raised by Alkire on judicial review as well as the multiple assessments that were completed by the physicians and psychologists.  The ALJ addressed each of the "paragraph B" criteria.  The ALJ determined that Alkire had only mild restriction with her activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation.  Thus, Alkire's impairments did not result in any of the "paragraph B" criteria.

In making this determination, the ALJ considered and discussed the assistance that Alkire receives from her husband, children, and church friends with some of her daily activities.  The ALJ also considered and discussed the neurological examinations and other assessments, which supported the ALJ's determination.

Again, the Court does not reweigh evidence when reviewing the ALJ's decision.  The ALJ did consider the limitations that Alkire raises on judicial review, and the Step Three determination was supported by substantial evidence.  Thus, this argument is not a basis to remand the ALJ's decision for further proceedings.

## C.    The ALJ Sufficiently Considered Alkire's Impairments When Making the RFC Determination

Lastly, Alkire argues that the ALJ failed to incorporate necessary limitations in the RFC determination when considering her ability to perform sedentary work.  She points out that when an ALJ determines a claimant's RFC, the ALJ is required to consider the entire combination of limitations on the claimant's ability to work.  *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). This requires that the ALJ consider not only the claimant's severe impairments but also the impairments that do not individually rise to the level of being "severe."  *Id.*

Alkire argues that the ALJ failed to consider the effects of her depression and additional lethargy and poor concentration resulting from her seizure medications.  She relies on the opinions of Dr. Salanova, nurse practitioner Stephanie Arnold, and Dr. Kennedy where they noted some limitations to Alkire's functioning.

The Commissioner responds to this argument by pointing out the "ALJ's considerable discussion of the testimony of Ellen J. Rozenfeld, Psy.D., who the ALJ called to testify specifically about Plaintiff's depression.  The ALJ considered Dr. Rozenfeld's testimony and opinion, as well as the opinions of the state agency psychologists, when assessing any limiting effects of Plaintiff's

depression." (Filing No. 10 at 10.)  The Commissioner also asserts that, while Alkire pointed out

one area of limitation noted by Dr. Kennedy, Alkire ignored the other findings of Dr. Kennedy and

her ultimate conclusion. The Commissioner explains,

> The ALJ acknowledged Dr. Kennedy's opinion about Plaintiff's areas of moderate
> limitation, and then accepted and adopted Dr. Kennedy's conclusion about
> Plaintiff's functional ability: "[C]laimant is able to: understand, carry out and
> remember simple instructions; able to make judgments commensurate with the
> functions of unskilled work; able to respond appropriately to brief supervision and
> interactions with coworkers and work situations; able to deal with changes in a
> routine work setting. Clmt appears capable of unskilled work." Tr. 326, 22 (RFC
> limiting Plaintiff to "unskilled, simple, routine, repetitive tasks with no fast-paced
> or high production quotas.  She is able to interact appropriately with co-workers
> and supervisors on an occasional basis.").

(Filing No. 10 at 11).

When determining Alkire's RFC, the ALJ specifically addressed the medical testimony

and evidence that directly dealt with the effects of Alkire's depression on her ability to function.

The ALJ briefly noted the side effects of Alkire's medications on her ability to function.  The ALJ

also discussed Alkire's depression medication and her husband's opinion that he was noticing an

improvement because of her medication. The ALJ adequately considered all of Alkire's

impairments, including the non-severe impairments, when making the RFC determination, and the

RFC was supported by substantial evidence.  Therefore, remand is not warranted on this issue.

## V.   CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**.

Alkire's appeal is **DISMISSED**.


**SO ORDERED.**


Date:  5/23/2016

_____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

20

DISTRIBUTION:

Joel L. Wesch
WESCH LAW FIRM
joelwesch@weschlawfirm.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov